UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division – In Admiralty

**ATLANTIC SPECIALTY INSURANCE COMPANY,**

    Plaintiff,

v.                                                                        Civil Action No. 3:21-cv-00002

**BOGDAN ANDREI BINDEA,**

    Defendant, Third-Party Plaintiff.

v.

**JOHN UHR, ASAP INSURANCE AGENCY, LLC
AND USG INSURANCE SERVICES, INC.**

    Third-Party Defendants

## THIRD-PARTY PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

**NOW COMES,** Defendant and Third-Party Plaintiff, Bogdan Andrei Bindea ("Bindea"), through undersigned counsel, who respectfully submits this opposition to the Motion to Dismiss (the "Motion") filed by USG Insurance Services, Inc. ("USG").

## STATEMENT OF FACTS

**I.    The Subject Incident Involving the M/V BOB ROUSE on November 17, 2020.**

This lawsuit stems from a marine casualty involving the M/V BOB ROUSE, a 100-foot utility vessel that was owned by Bindea (the "Vessel"). On or around November 17, 2020, the Vessel, while in transit from Port-au-Prince, Haiti to Mole Saint Nicolas, Haiti, encountered rougher than expected seas, causing the Vessel to capsize (the "Incident").[1] In the aftermath of the

---

[1] Third-Party Complaint, Dkt. 5, at ¶39.

{N1877574 -}                                        1

Incident, two of the seven crew members were lost at sea and presumed dead, while other crew members received mild to moderate injuries.

Bindea learned of the Incident on November 19, 2020.[2] That same day, Bindea contacted Third-Party Defendant John Uhr ("Uhr") to notify him about the Incident.[3] Bindea had previously used Uhr, and his insurance agency, ASAP Insurance Agency, LLC ("ASAP"), to secure coverage for the Vessel. Bindea requested that Uhr forward notice of the Incident to Atlantic Specialty Insurance Company ("Atlantic Specialty"), which had issued a Commercial Marine Package to Bindea (the "Policy") providing various coverages on the Vessel, including Protection & Indemnity ("P&I") and Hull & Machinery coverages.[4] Bindea, through counsel, also directly notified Atlantic Specialty of the Incident.[5]

On November 30, 2020, Bindea received correspondence from Intact Insurance on behalf of Atlantic Specialty, which acknowledged notice of the loss provided by "your broker, USG Insurance Services, Inc."[6] Atlantic Specialty took the position that coverage was voided or reduced on several bases, including, and most significantly, based on the Policy's Navigational Warranty confining the area of operations to the east coast of Florida, as well as the crew endorsement in the P&I portion of the Policy, which limited the number of crew members to three.

---

[2] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶40.

[3] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶40

[4] The Policy is attached to Atlantic Specialty's declaratory judgment complaint (Dkt. 1) as Exhibit G (Dkt. 1-7).

[5] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶41.

[6] It is unclear why there was such a significant delay between the time that Uhr was provided notice of the Incident (November 19, 2020) and the time that Atlantic Specialty (through Intact) acknowledged notice (November 30, 2020). Given the significance of the Incident, Bindea, through counsel, repeatedly requested that Uhr place the underwriter on notice so that the insurer could become involved in the possible salvage of the Vessel.

## II. Atlantic Specialty's Complaint for Declaratory Judgment.

Atlantic Specialty commenced these proceedings on January 13, 2021 by filing a Complaint for Declaratory Judgment and seeking a declaration that coverage was voided under the Policy.[7] Specifically, Atlantic Specialty seeks to void coverage on several grounds, including *inter alia,* that: (1) the Vessel breached the Navigational Warranty in the Policy by operating outside of the coast of Florida, (2) the Vessel was placed under the control of a Haitian captain at the time of the Incident, (3) the Vessel was operating unlawfully at the time of the Incident, and (4) Bindea failed to disclose multiple, material facts and circumstances when applying for the Policy.[8] Atlantic Specialty also sought a declaration for reduction in P&I coverage limits based on the fact that the number of crew members on board the Vessel at the time of the Incident exceeded the crew endorsement.[9]

In support of its Complaint, Atlantic Specialty attached two insurance applications, which it alleged Bindea submitted in connection with procuring the subject Policy. Atlantic Specialty contends that Bindea made the following representations in these applications: (i) that he had been operating vessels for 25 years, (ii) that the navigational limits for coverage were around the area of Florida, and (iii) that the Vessel would have a crew of three persons and no other persons would be aboard the Vessel during operations.[10] Bindea specifically denies that he filled out or executed these applications or that he authorized anyone to fill out or execute them on his behalf.[11]

---

[7] Atlantic Specialty's Complaint for Declaratory Judgment is Dkt. 1.

[8] Atlantic Specialty's Complaint for Declaratory Judgment, Dkt. 1, at ¶50.

[9] Atlantic Specialty's Complaint for Declaratory Judgment, Dkt. 1, at ¶¶51-53.

[10] Atlantic Specialty's Complaint for Declaratory Judgment, Dkt. 1, at ¶¶17-21.

[11] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶¶XVII-XXI.

On February 24, 2021, Bindea answered the Complaint for Declaratory Judgment largely denying the allegations. Bindea also counterclaimed for a declaration that Atlantic Specialty should be estopped from relying on the Policy provisions to avoid coverage.[12] In particular, Bindea asserted that Atlantic Specialty should be precluded from relying on the Policy limitations on coverage, including the Navigational Warranty, to avoid coverage where Atlantic Specialty failed to disclose to Bindea that coverage would be voided should the Vessel travel outside of the east coast of Florida. Bindea affirmatively pled that he had not been provided with a copy of the Policy and the that the Certificate of Insurance he was provided with conflicted with the limitations on geographic coverage and insured value that Atlantic Specialty sought to enforce.[13]

### III. Bindea's Third-Party Complaint.

In addition, pursuant to Fed. R. Civ. P. 14, Bindea also filed a Third-Party Complaint naming Uhr, ASAP, and USG as Third-Party Defendants. In particular, Bindea alleged that he contacted Uhr and his agency, ASAP, to assist with procuring marine insurance for the Vessel.[14] Bindea alleges that he exchanged numerous phone calls and text messages with Uhr and ASAP wherein he conveyed that the Vessel would be operating primarily in support of humanitarian relief work in or around Haiti.[15] In fact, many of these communications took place while Bindea was aboard the Vessel and traveling from Louisiana to Haiti.[16]

Bindea alleges further that Uhr and ASAP contracted with USG to procure the marine coverages sought by Bindea for the Vessel based on its anticipated type and area of operations.[17]

---

[12] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶¶42-49.

[13] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶28 and ¶33.

[14] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶12.

[15] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶14.

[16] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶13.

[17] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶16.

USG is an insurance wholesaler operating nationwide and holds itself out as an expert "in 'problem solving' for all lines of commercial coverages," that "specializ[es] in challenging risks."[18] Bindea alleges that USG, occupying the position of an insurance wholesale broker, was fully aware that it had been utilized by Uhr and ASAP to secure coverage for the benefit of Bindea.[19] On March 20, 2020, USG procured the Policy from Atlantic Specialty, and USG is listed as the "Producer" on the Policy.[20] Leigh Berry, a First Vice President at USG, sent an email to Uhr in which she confirmed that coverage had been bound on the Vessel.[21] Uhr forwarded Ms. Berry's email to Bindea.

At no time did Bindea advise Uhr, ASAP, or USG, either implicitly, expressly or otherwise, that the Vessel would operate solely within the east coast of Florida or that the persons on board the Vessel would be limited to three people.[22] To the contrary, Uhr and ASAP had direct knowledge that the Vessel would be operating in Haiti and, further, they were believed to have conveyed this information to USG in connection with procuring coverage for the Vessel.[23] Significantly, however, despite having knowledge that the Vessel would operate in or around Haiti, Uhr, ASAP, and USG procured marine insurance coverage with navigational limitations and warranties that were improper based on the Vessel's anticipated area of operations.[24] Moreover,

---

[18] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶16.

[19] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶17.

[20] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶¶19-20.

[21] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶21.

[22] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶25.

[23] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶25.

[24] *See, e.g.,* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶27, ¶53, and ¶58.

Uhr, ASAP, and USG failed to advise Bindea that coverage may be denied for any accidents or losses sustain outside of the Navigational Area of Florida.[25]

Likewise, Bindea never suggested to Uhr, ASAP, or USG that the persons and/or crew on board the Vessel would be limited to three persons.[26] At no time did Uhr, ASAP, or USG alert or advise Bindea that P&I coverage could be voided or reduced should there be more than three persons aboard the Vessel at the time of a loss or incident.[27] Bindea was alcose pr

To the contrary, rather than properly advising Bindea of the foregoing issues, Uhr, ASAP, and USG represented to Bindea that the proper coverages had been placed on the Vessel.[28] Biden was a also provided with a Certificate of Insurance showing no territorial limitations on coverage and listing the insured value of the Vessel of $600,000 for Hull & Machinery coverage.[29] Based on these assurances from Uhr, ASAP, and USG, who each held themselves out as highly experienced insurance professionals, Bindea believed that the proper coverages had been placed on the Vessel. Bindea, however, learned that this belief was not true when Atlantic Specialty provided notice on November 30, 2020 that it believed coverage had been suspended during the Incident, and thereafter filed its Complaint for Declaratory Judgment seeking to avoid coverage.

## LAW AND ARGUMENT

I.  **Legal Standard Under Rule 12(b)(6).**

Based on all the foregoing facts, Bindea, in his Third-Party Complaint, contends that Third-Party Defendants, including USG, are liable to the extent that the Policy they procured for him is

---

[25] *See, e.g.,* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶29, and ¶71.

[26] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶37.

[27] *See, e.g.,* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶38, ¶61, and ¶72.

[28] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶21.

[29] The Certificate of Insurance was attached as Exhibit A to Bindea's Answer, Counterclaim and Third-Party Complaint and is in the record at Dkt. 5-2.

found not to provide coverage for the Incident. Bindea asserts claims of Negligence (Count II), Breach of Fiduciary Duty (Count III), Negligent Misrepresentation (Count IV), and Negligent Failure to Warn (Count V).[30] USG has moved for dismissal, under Rule 12(b)(6), on the basis that the Third-Party Complaint fails to state a claim upon which relief may be granted.

"[M]otions to dismiss via FRCP 12(b)(6) are viewed with disfavor, rarely granted, and construed in the light most favorable to the non-movant…" *Volpone v. Caldera*, 190 F.R.D. 177, 180 (E.D. Va.1999) (citing *Labram v. Havel*, 43 F.3d 918 (4th Cir.1995)). Thus, although Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted," the Rule must be read in conjunction with Rule 8(a), which simply requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In considering a motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir.2004) (citation omitted).

II. **A Rule 12(b)(6) Motion is Not the Proper Mechanism for Seeking Dismissal of an Improper Third-Party Complaint; In any Event, USG's Request Should be Denied Because Courts Have Frequently Permitted Rule 14 Impleader Under Similar Circumstances.**

In its Motion, USG takes issue with Bindea's use of Fed. R. Civ. P. 14 to implead USG and others into this proceeding, which was originally instituted as a declaratory judgment action by Atlantic Specialty seeking a finding of non-coverage under the Policy for the subject incident. USG asserts that third-party practice under Fed. R. Civ. P. 14 is typically limited to claims of contribution or indemnity where the third-party defendant is liable for all or part of the main (or original) claim.[31]

---

[30] *See* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶¶50-73.

[31] Dkt. 29 at p. 4.

From the outset, USG's request should be denied because this issue is not properly raised in a Rule 12(b)(6) Motion. Rather, the proper mechanism for a party to seek dismissal of Third-Party Demand is a motion to strike or sever pursuant to Fed. R. Civ. P. 14(a)(4) which provides that party "may move to strike the third-party claim, to sever it, or to try it separately." Because USG has not sought dismissal via Rule 14(a)(4) motion to strike, its request should be denied.

Moreover, though Bindea acknowledges that the language of Fed. R. Civ. P. 14 indicates that it applies when the third-party defendant "is or may be liable to [the third-party plaintiff] for all or part of the claim against it," the majority of federal courts do not construe this Rule so narrowly. Rather, courts have consistently recognized that a party may permissibly use Fed. R. Civ. P. 14 impleader "in declaratory judgment cases ***where an adverse ruling on the underlying action may cause the original defendant to suffer a loss for which the third-party defendant may be liable***." *State Coll. Area School Dist. v. Royal Bank of Canada,* 825 F.Supp.2d 573, 579-80 (M.D. Pa. 2011) (emphasis added). See also 6 FED. PRAC. & PROC. CIV. § 1446 (2d ed.). ("A third-party claim may be asserted under Rule 14(a) only when the third party's liability is in some way dependent on the outcome of the main claim.").

Consistent with this concept, courts have routinely allowed impleader under similar circumstances presented here – namely, when a first-party defendant insured in a declaratory action impleads the insurance brokers and agents that may be liable to him should the first-party plaintiff insurer prevail on the underlying declaratory judgment action. In *Old Republic Ins. Co. v. Concast, Inc.*, 99 F.R.D. 566 (S.D.N.Y.1983), an insurer brought a declaratory judgment action seeking a determination that it was not required to cover a subcontractor of the defendant under its policy with the defendant. The defendant impleaded the insurance broker, alleging that the broker would be responsible for any liability the defendant or subcontractor would incur as a result of a

finding that the insurer did not have to provide coverage. The court allowed the impleader of the insurance broker under Rule 14(a), noting that its:

> decision regarding the contract issue of whether [the insurer's] insurance policy covers [the subcontractor] will certainly require evidence regarding negotiations between [the insurer] and [the broker]. That evidence forms a core of facts that plays a significant role in the resolution of both the main claim and the third-party complaint. [The broker's] testimony will be vital to the case and it would be wastefully duplicative to require [defendant and its subcontractor] to proceed against it in a separate case. Moreover, impleader not only saves the time and expense of reduplication of evidence, it increases the likelihood that consistent results may be obtained from similar or identical evidence.

*Id.* at 569.

Similarly, in *Navigators Ins. Co. v. Univ. of Louisville Found., Inc.*, 329 F.R.D. 557, 561 (W.D. Ky. 2019), the court allowed an insured to implead its broker into a declaratory judgment action on the basis that the outcome of the underlying declaratory judgment action would be determinative of the broker's liability to the insured:

> The [Insured]'s Third-Party Complaint seeks to hold [the Insurance Broker] responsible for the damages it would incur if this Court finds the insurance policy to be null and void because of [the Insurance Broker]'s involvement in the application process. If [Insurer] is successful on its declaratory judgment action, the [Insured] could suffer a loss for which [the Insurance Broker] may be liable. However, the [Insured] would likely not seek to recover damages from [the Insurance Broker] if [Insurer] receives an adverse ruling. Essentially any liability that [the Insurance Broker] may have to the [Insured] is dependent on the Court's ruling on [Insurer's] underlying declaratory judgment claim.

Other courts that have allowed impleader of the broker/agent that procured the coverage in insurance-related declaratory judgment actions include: *Country Mut. Ins. Co. v. Rocky Mountain Const. Co., LLC*, 2013 WL 438940, at *4-5 (D. Colo. 2013) (in declaratory action by insurance company seeking declaration of non-coverage under commercial general liability insurance policy,

allowing defendant insured to implead individual insurance agents on claims of negligence, breach of fiduciary duty, negligent misrepresentation, and negligent failure to warn); *American Fidelity & Cas. Co. v. Greyhound Corp.*, 232 F.2d 89, 91-92 (5th Cir. 1956); *Arch Ins. Co. v. Harleysville Worcester Ins. Co.*, 56 F. Supp. 3d 576, 584 (S.D. N.Y. 2014); *Southern Pilot Ins. Co. v. CECS, Inc.*, 15 F. Supp. 3d 1284, 1292-94 (N.D. Ga. 2013).

The core premise behind Bindea's claims against the third-party defendants, Uhr, ASAP, and USG is that, to the extent this Court finds that the Policy does not afford coverage for the Incident, then the third-party defendants are liable to Bindea for failure to procure the proper coverages for the Vessel. This is precisely the type of situation for which the courts have allowed impleader under Rule 14. Allowing Bindea's third-party claims to proceed in the same proceeding as the underlying declaratory judgment action would certainly promote judicial economy by avoiding wasteful and duplicative proceedings and possibly inconsistent results. Moreover, the actions are likely to involve overlapping witnesses and evidence. For all these reasons, USG's assertions that impleader under Rule 14 is improper should be rejected.

### III. USG Misstates the Relief Sought By Bindea Against the Third-Party Defendants.

USG also contends that the Court should exercise its discretion to dismiss the Third-Party Complaint, which it suggests seeks "only declarative relief." This is blatant misreading of the Third-Party Complaint and the relief sought therein which clearly is not limited to declaratory relief (and indeed Bindea does not seek any type of declaratory relief against the third-party defendants). The Declaratory Judgment, 28 U.S.C. § 2201, provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought…" 28 U.S.C. § 2201, together with Fed. R. Civ. P. 57, permit

the availability of declaratory relief whether or not the claimant also seeks "coercive" relief such as damages or injunctive relief.

Here, the *only* declaratory relief sought in the Third-Party Complaint is in Count I (Declaration that Coverage Exists for the Incident) in which Bindea seeks a declaration that the Vessel should be held covered under the Policy.[32] In Counts I through V, each of which is directed at USG and the other third-party defendants, Bindea clearly seeks coercive relief in the form of *damages*.[33]

Seeking to transform Bindea's clear claims for *money* damages against it, USG focuses on language used by Bindea in his Prayer for Relief where he prayed as follows:

> [S]hould the Court determine that there is no coverage under the Policy, a judgment **declaring** that USG is obligated to pay compensatory damages to Bindea, including, but not limited to, any and all amounts to necessary to compensate Bindea for the losses sustained by the Vessel due to the Incident…[34]

Simply because Bindea used the term "declaring" in the Prayer for Relief in connection with his claims against USG does not somehow transform what is clearly a request for *coercive* relief in the form of *damages* into a claim for declaratory relief. Indeed, Bindea is not asking the Court for any type declaration of its rights and remedies with respect to USG, but rather is simply seeking to recover damages against USG based on its alleged fault and role in failing to ensure that the proper coverages were placed on the Vessel based on its anticipated area of operations. USG's request for dismissal on this basis must be denied.

---

[32] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶49.

[33] *See* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶54 (alleging Bindea has suffered *damages* due to third-party defendants' negligence); *id.* at ¶59 (alleging Bindea has suffered *damages* due to third-party defendants' breach of fiduciary duty); *id.* at ¶66 (alleging Bindea has suffered *damages* due to third-party defendants' negligent misrepresentation); *id.* at ¶73 (alleging Bindea has suffered *damages* due to third-party defendants' negligent failure to warn).

[34] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶(4) of Prayer for Relief.

## IV. Bindea Has Stated Viable Claims Against USG.

It is only USG's final two arguments in which it actually seeks dismissal based on the substance of Bindea's allegations. In particular, USG seeks dismissal of these claims on *only* two substantive grounds, namely – (1) Bindea has failed to allege a causal link between USG's conduct and Bindea's damages and (2) the economic loss rule bars Bindea's claims against USG. Both of USG's arguments are without merit and must be rejected.

### A. Bindea Adequately Alleges Causation.

Bindea alleges that the marine insurance applications that were shopped around on his behalf by Uhr, ASAP, and USG contained material inaccuracies as to where the Vessel would operate and how many crew members would be on board.[35] This, in turn, led to the procurement of insurance without the appropriate warranties and limitations as to Vessel location and crew.[36]

It its Motion, USG takes the position that Bindea fails to allege a causal link between USG's conduct and the damage sustained by Bindea. In particular, USG argues that Bindea fails to allege that "accurate information would have yielded the coverage Bindea sought."[37] Rather, USG argues, an accurate insurance application would have demonstrated that Bindea intended to place the Vessel under the command of a Haitian captain in violation of US law.[38] USG's assertions – that an accurate application would have revealed Bindea's intent to use a foreign crew and this would lead to a refusal by Atlantic Specialty (or any other insurer) to place coverage on the Vessel – is fundamentally flawed and must be rejected for several reasons.

---

[35] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶26.

[36] *See, e.g.,* Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶53; ¶58; ¶63.

[37] Dkt. 29 at p. 6.

[38] Dkt. 29 at p. 6.

As an initial matter, USG improperly premises its argument by referring to the contents of the insurance applications and its (incorrect) assertion that such applications inquired about the citizenship of the captain and crew that Bindea planned to operate the Vessel. Importantly, these applications were not attached to the relevant pleading, Bindea's Third-Party Complaint, which is the only document this Court may consider when resolving this Motion. *See Hickey v. Bon Secours Richmond Health Sys.*, 2012 WL 6623039, at *2 (E.D. Va. Dec. 19, 2012) ("Courts generally may not consider materials outside the complaint in ruling on a motion to dismiss without converting the motion to one for summary judgment."). It would be completely improper for the Court to resolve this Motion in USG's favor based on USG's asserted (but unsupported) contentions as to what an accurately filled out application may have revealed.[39]

But more important, the insurance applications at issue ***did not inquire about the citizenship of the captain and the crew***. Therefore, USG's suggestion, that an accurate application would have demonstrated Bindea's intent to have a Haitian crew operate the Vessel, is belied by the fact that the applications did not even seek out such information.

Finally, Bindea submits that USG's argument must be rejected because there is nothing in the Policy at issue that voids coverage for using a foreign crew. Indeed, Atlantic Specialty's declaratory judgment action demonstrates that there is no provision within the Policy that expressly voids coverage based on the use of a foreign crew or captain. In particular, although Atlantic Specialty does seek to void coverage, in part, based on Bindea's use of foreign captain and crew, it relies on one provision in the P&I portion of the policy that voids coverage based on "Engagement in unlawful trade or performance of an unlawful act with knowledge of the

---

[39] To the extent this Court elects to consider USG's references to extraneous documents, it must convert this Motion to a Motion for Summary Judgment under FRCP 56 and allow both parties the opportunity to submit all materials that are pertinent to the Motion. *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 360 (4th Cir. 2013) (citing Fed.R.Civ.P. 12(d)).

Insured."[40] Thus, to prevail on voiding coverage based on the use of a Haitian crew, Atlantic Specialty will be required to demonstrate that Bindea had **_knowledge_** that such act was unlawful. Moreover, this provision only applies to P&I coverage, and as such is not also applicable to the other coverages in the Policy, including Hull & Machinery coverage.

In sum, the arguments asserted by USG in support of its lack of causation arguments are meritless. USG's arguments are also improper on a Rule 12(b)(6) insofar as they reference and rely on matters outside of the pleadings. The Motion should be denied.

**B. The Economic Loss Rule Does Not Apply to Bar Bindea's Claims Against USG.**

Finally, USG claims that the economic loss rule bars Bindea's tort claims against it. USG, without performing any sort of choice of law analysis as to the substantive law applicable to Bindea's claims, relies entirely on a Virginia Supreme Court case, *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 613 (2004), to support this contention.

USG's reliance on the economic loss rule (also called the source of the duty rule) must be rejected. First, Bindea disputes that Virginia's economic loss rule should apply to his claims against USG and submits that this important determination of what substantive law applies to Bindea's claims against USG is improper on a Motion to Dismiss. If anything, however, the circumstances suggest that the law of Pennsylvania should apply to the issue and Pennsylvania courts have specifically recognized that the economic loss rule does not bar tort claims under similar facts as those presented here.

Moreover, even if this Court were to accept USG's position that Virginia tort law (including the state's application of the economic loss rule) applies, Bindea notes that his claims should still survive because Virginia law only bars tort claims for *purely* economic damages. Here,

---

[40] Dkt. 1 at ¶34.

{N1877574 -} 14

Bindea seeks recovery for property damage – namely, the total loss of the Vessel after the Incident. Thus, he seeks to recover the very type of damages (property damages) that Virginia law recognizes are not subject to the economic loss rule. For these reasons, USG's reliance on the economic loss rule must be rejected and the Motion denied.

> 1. **USG fails to perform a choice of law analysis as to the law applicable to Bindea's claims against USG, and Bindea disputes the application of Virginia law to same.**

Though the Policy at issue is a marine insurance policy. Bindea's claims against the Third-Party Defendants are subject to a typical choice of law analysis. *See Bay Fireworks, Inc. v. Frenkel & Co.*, 359 F. Supp. 2d 257, 265 (E.D.N.Y. 2005) (holding that New Jersey applied to negligence claims that were asserted by the insured against the brokers of a maritime insurance policy where "all of the events occurred in New Jersey and the subject matter of the policy was at all times in that state.").[41] Moreover, Virginia courts, when analyzing the tort law applicable to multi-state disputes, have consistently found that the law of the place of the tortious conduct (also called lex loci delicti) supplies the substantive law to tort claims. *See, e.g., McMillan v. McMillan*, 219 Va. 1127, 1128, 253 S.E.2d 662, 663 (1979).

Pursuant to lex loci delicti, the facts and circumstances at this very preliminary stage of the proceedings indicate that Pennsylvania law, rather than Virginia law, should apply to Bindea's claims against USG. In particular, USG is organized under the laws of Pennsylvania and is listed as having its principal place of business in Cannonsburg, Pennsylvania.[42] Leigh Berry, the USG Vice President who confirmed that coverage had been placed for the Vessel, has a Pennsylvania area code and is believed to work out of USG's Cannonsburg office. Based on these facts, Bindea

---

[41] Bindea notes that Atlantic Specialty invoked the Court's admiralty jurisdiction and diversity jurisdiction as potential bases for federal subject matter jurisdiction in this matter.

[42] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶5.

submits that USG's alleged tortious conduct very likely occurred in the state of Pennsylvania and therefore that state's law, including its version of the economic loss rule, should apply to Bindea's claims against USG.

Pennsylvania courts recognize generally the economic loss rule, which states that: "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Adams v. Copper Beach Townhome Cmtys., L.P*., 816 A.2d 301, 305 (Pa.Super.2003). A narrow exception to this general rule exists, however, with respect to "cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005). The basis for this exception, which was adopted by the Pennsylvania Supreme Court in *Bilt-Rite Contractors* is Section 552 of the Restatement (Second) of Torts which states in pertinent part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1).

In *Bilt-Rite*, the defendant, an architect, supplied designs and specifications to be used by contractors in preparing bids for a construction project. *Bilt-Rite*, 866 A.2d at 272. The designs indicated that certain portions of the project could be installed and constructed "through the use of normal and reasonable construction means and methods, using standard construction design

tables." *Id*. Once the project commenced, however, the winning bidder discovered that the work required special construction methods "resulting in substantially increased construction costs." *Id*.

The winning bidder, Bilt-Rite, sued for negligent misrepresentation, arguing that it had justifiably relied on the architect's misrepresentations in crafting its winning bid. *Id*. The defendant responded that such claims were barred by the economic loss doctrine. *Id*. at 272-73. The Pennsylvania Supreme Court sided with the plaintiff, holding that Section 552 "sets forth the parameters of a duty owed when one supplies information to others, for one's pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." *Id*. at 285-86. Having found both that Bilt–Rite stated a viable claim for negligent misrepresentation under Section 552 and that privity was not a prerequisite for maintaining such an action, the court found that Bilt–Rite was "not…barred from recovering the damages it incurred, if proven." *Id.* at 288.

In *Durkey v. Pac. Life Ins. Co*., 2017 WL 8941225, at *4 (W.D. Pa. Aug. 4, 2017), a Pennsylvania federal district court adopted the rationale applied in *Bilt-Rite* to claims for negligent misrepresentation against an insurance agent upon which the plaintiffs relied to purchase life insurance. The court reasoned that the insurance agent defendant was "an experienced insurance agent, was in the business of offering information about Pacific Life's insurance products for his own pecuniary gain," and therefore the "transaction falls squarely within the purview of Section 552 and, as such, the *Bilt-Rite* exception to the economic loss rule applies." *Id.* at *4.

The *Durkey* case supports Bindea's claims against the Third-Party Defendants, including USG, who likewise held themselves out as experienced insurance industry participants, particularly in the area of sophisticated or complicated insurance issues.[43] Bindea relied on these

---

[43] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at ¶16.

representations, along with the Third-Party Defendants' assurances that the proper coverages had been placed for the Vessel. Accordingly, Bindea submits that the *Bilt-Rite* exception to the economic loss rule as recognized under Pennsylvania law (the law where USG's tortious conduct is believed to occur) allows for recovery of economic damages. Alternatively, Bindea submits that USG's request for dismissal based on the economic loss rule should be denied at this juncture of the proceedings because it is unclear as to which state's substantive laws should apply to Bindea's claims in this multi-party and multi-state tort dispute.

      **2.      Even under Virginia law, the economic loss rule does not preclude Bindea's claims because they seek recovery for property damage.**

Even if Virginia law applies, the economic loss rule should not apply because Virginia itself recognizes an exception to the rule where the plaintiff seeks both property damages and economic damages.

As stated in USG's own cited case, *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 613 (2004): the "primary consideration underlying tort law is the protection of persons and property from injury, while the major consideration underlying contract law is the protection of bargained for expectations." The law of torts provides redress only for the violation of certain common law and statutory duties involving the safety of persons and property. *Id*. Therefore, if an action for negligence is brought and damages other than, or in addition to, economic losses are alleged, ***including property damage***, privity is not required. *See* VA Code Ann. § 8.01.223 (emphasis added). Here, Bindea specifically alleges that he seeks recovery against USG, in part, for "any and all amounts to necessary to compensate Bindea for ***the losses sustained by the Vessel due to the Incident***."[44] Thus, Bindea has clearly alleged that he is seeking to recover both economic and

---

[44] Bindea Answer, Counterclaim and Third-Party Complaint, Dkt. 5, at Prayer for Relief, para. 4 (emphasis added).

property damage to the Vessel such that the economic loss rule does not apply.[45] For this additional reason, USG's reliance on the economic loss rule as a defense to Bindea's claims should be rejected.

## CONCLUSION

For the foregoing reasons, USG's Motion to Dismiss should be denied.

Dated: May 20, 2021

/s/ Douglas A. Winegardner
Douglas A. Winegardner (VSB No. 46570)
Robert B. Delano, Jr. (VSB No. 20619)
Sands Anderson, PC
Bank of America Center, Ste. 2400
1111 East Main Street (23219)
P.O. Box 1998
Richmond, Virginia 23218-1998
Telephone: (804) 648-1636
Facsimile: (804) 783-7291
dwinegardner@sandsanderson.com
rdelano@sandsanderson.com

**-AND-**

/s/ W. Spencer King
**HENRY A. KING (LA #7393)**
**MICHAEL L. VINCENZO (LA #23965)**
**W. SPENCER KING (LA #35863)**
**KING & JURGENS, LLC**
201 St. Charles Avenue, 45th Floor
New Orleans, Louisiana 70170
Telephone: (504) 582-3800
Facsimile: (504) 582-1233
Email:
hking@kingjurgens.com
mvincenzo@kingjurgens.com
sking@kingjurgens.com

*Attorneys for Defendant/Third-Party Plaintiff Bogdan Bindea*

---

[45] In fact, Virginia courts have suggested that a claim for a failure to procure insurance is a type of ***property damage***. *See Cincinnati Ins. Co. v. Ruch*, 940 F.Supp.2d 338, 344 (E.D. Va.2013) ("Hylton Hall had a valid failure to procure insurance claim against Defendants. An assessment of the underlying facts shows that the claim sounded in property damage (destruction of the Property) and contract (breach of the alleged oral agreement between Hylton Hall and Ruch").