IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division – In Admiralty

| | | |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) | |
|     Plaintiff & Counter Defendant, | ) ) | Civil Action No. 3:21-cv-00002 |
| v. | ) ) | |
| BOGDAN ANDREI BINDEA, | ) | |
|     Defendant & Counter Claimant. | ) | MEMORANDUM OPINION |
| BOGDAN ANDREI BINDEA | ) | |
|     Third-Party Plaintiff, | ) | By:   Joel C. Hoppe |
| v. | ) ) |          United States Magistrate Judge |
| USG INSURANCE SERVICES, et al., | ) | |
|     Third-Party Defendants. | ) | |

This declaratory judgment action is before the Court on Plaintiff Atlantic Specialty

Insurance Company's ("ASIC") motion for judgment on the pleadings under Rule 12(c) of the

Federal Rules of Civil Procedure. ECF No. 35. ASIC seeks declaratory judgment that a marine

insurance policy ASIC issued to Defendant Bogdan Bindea in March 2020, Compl. Ex. G, ECF

No. 1-7, is "null and void," or, alternatively, that ASIC is not required to cover a pending claim

relating to Bindea's supply vessel because "Bindea had breached the policy" when the loss

occurred. Pl.'s Br. in Supp. 1, ECF No. 36; *see* Compl. 9–10, ECF No. 1. Bindea opposes

ASIC's motion as premature. *See generally* Def.'s Br. in Opp'n 9–17, ECF No. 45. He has also

filed his own claim against ASIC seeking declaratory judgment that the Policy at issue here fully

covers Bindea's supply vessel—even though he admits that he was not aware of and never

agreed to the Policy's terms, conditions, and exclusions on coverage. *See generally* Countercl. ¶¶

8–9, 19, 24–49, ECF No. 5. The Court finds that there are no disputed material facts bearing on

the parties' coverage dispute and that ASIC is entitled to judgment as a matter of law that it is not obligated to cover Bindea's claim for the Loss at issue.

## I. Background[1] & Procedural History

Bindea owns the offshore supply vessel "M/V Bob Rouse." *See* Compl. ¶ 7, ECF No. 1; Bindea Answer ¶ VII (admitted), ECF No. 5; Compl. Ex. A, at 13 (bill of sale), ECF No. 1-1. In 2020–2021, the vessel was registered with the U.S. Coast Guard as hailing from port at Ft. Lauderdale, Florida, and having both "coastwise" and "registry" operational endorsements.[2] Compl. Ex. C, U.S. Coast Guard Nat'l Vessel Documentation Ctr., Certificate of Documentation (issued Jan. 15, 2020), ECF No. 1-3. On November 17, 2020, the Bob Rouse was transporting cement from Port-au-Prince, Haiti, to Môle Saint-Nicolas, Haiti. Compl. ¶ 9; Bindea Answer ¶ IX (admitted). The ship hit rough waters, causing it to capsize ("the Loss") on the Caribbean Sea. *See* Compl. ¶ 10; Compl. Ex. B, at 8, ECF No. 1-2; Bindea Answer ¶ X (admitted); Countercl. ¶ 39, ECF No. 5. The overturned vessel and five crew members, all Haitian citizens, were found floating in Canal de Saint-Marc near Gonâve Island, Haiti, on November 19, 2020. *See* Compl. Ex. B, at 1–3; Compl. ¶¶ 10–12; Bindea Answer ¶¶ X–XII. Two other crew members are missing

---

[1] The facts in this section are generally undisputed. They come from ASIC's Complaint; ECF No. 1; the written Commercial Marine Insurance Package policy attached as Exhibit G to ASIC's Complaint, ECF No. 1-7; Bindea's combined Answer, Counterclaim, and Third-Party Complaint, ECF No. 5; and other written instruments attached as exhibits to ASIC's Complaint that are authentic and integral to both parties' pleadings, *e.g.*, Countercl. & Third-Party Compl. ¶¶ 26, 53, 58 56 (referencing Compl. Exs. D & F, ECF Nos. 1-4, 1-6). *See generally* Fed. R. Civ. P. 10(c); *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). Any disputed facts and reasonable inferences drawn therefrom are presented in Bindea's favor as the nonmoving party. *See Massey*, 759 F.3d at 353 ("[W]e are not obliged to accept [the non-movant's] allegations that represent unwarranted inferences, unreasonable conclusions, or arguments, or that contradict matters properly subject to judicial notice or by exhibit." (quotation marks omitted)).

[2] "A registry endorsement entitles a vessel to employment in the foreign trade . . . and any other employment for which a coastwise[] or fishery endorsement is not required." 46 C.F.R. § 67.17(a). "A coastwise endorsement entitles a vessel to employment in unrestricted trade, dredging, towing, and any other employment for which a registry or fishery endorsement is not required." *Id.* § 67.19(a). For supply vessels, "[c]oastwise refers to a route not more than 20 nautical miles offshore on . . . waters" including "any ocean," the Gulf of Mexico, and the Caribbean Sea. *Id.* § 125.160.

and presumed dead. Bindea Answer ¶ XII. Bindea promptly hired a salvage company to rescue the crew and tow the ship to a wharf on Gonâve Island. *See* Compl. Ex. B, at 1–3, Email from M. Vincenzo to J. Uhr (Nov. 24, 2020, 11:10 AM). His attorney then emailed Bindea's insurance agent, John Uhr of ASAP Insurance Agency, noting that the Bob Rouse was insured under a marine insuring agreement (Policy No. B5JH04214) issued by ASIC and indicating that Bindea expected ASIC to "assist in [the] incident response." *Id.* at 1, 3; *see generally* Compl. Ex. G, at 2–49 (Commercial Marine Package Policy No. B5JH04214), ECF No. 1-7. The salvage company billed Bindea $27,200.00 to tow the Bob Rouse to port and "to turn over the vessel in St. Marc." Compl. Ex B, at 24 (Nov. 23, 2020). Bindea "has made a claim to ASIC for insurance coverage as a result of the Loss." Compl. ¶ 13; *see* Bindea Answer ¶ XIII (admitted).[3]

The Commercial Marine Package ("CMP") policy at issue (Policy No. B5JH04214) names Bindea as the "insured" and lists the "M/V 'Bob Rouse'" as the covered Vessel for a period from March 20, 2020, to March 20, 2021. Compl. Ex. G, at 2–5 (Declarations). ASIC accepted "significant premiums" from Bindea on this policy.[4] Countercl. ¶ 46; ASIC Answer ¶ 46 (admitted), ECF No. 11; *see* Compl. Ex. G, at 7 (installment schedule). The CMP Policy provides coverage for (i) commercial marine liability, including vessel protection and indemnity, and (ii) hull physical damage. Ex. G, at 8; *see* Compl. ¶¶ 23–25; Bindea Answer ¶¶ XXIII–XXV (citing Compl. Ex. G); Countercl. ¶ 19 (citing Compl. Ex. G). Each part "is subject to its own terms, conditions, exclusions and endorsements." Compl. Ex. G, at 8. "There are also General

---

[3] The pleadings do not specify the type of coverage for which Bindea made the claim.

[4] The premium amounts appear to have been redacted from the CMP Policy attached to ASIC's complaint, Compl. Ex. G, at 4–5, 7, and Bindea does not say how much he paid in premiums or when he paid them, *see* Countercl. ¶ 46.

Conditions of Coverage" and "General Exclusions from Coverage" that apply to both coverage parts. *Id.* Three conditions or exclusions are most relevant here.

First, with respect to coverage generally, the CMP states that "[b]y accepting this policy," the insured agrees "[t]he statements in the Declarations are accurate and complete; [t]hose statements are based on representations you made to [ASIC]; and [ASIC] issued this policy in reliance upon [those] representations." Compl. Ex. G, at 44 ("This insurance Policy shall be void as to all interests insured if, whether before or after a loss, any insured hereunder has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof . . . ."). Second, with respect to both liability and hull physical damage coverage, the CMP states, "that the Vessel shall be confined to the Navigational Area described in the Declarations," and if the "[V]essel exceeds the Navigation Area, then all coverage herein is suspended until the [V]essel safely returns to the Navigation Area." *Id.* at 27, 36. The Declarations define the Bob Rouse's "Navigation Area" as "[w]ithin the east coast of Florida." *Id.* at 5.

Third, with respect to liability coverage only, the CMP provides that insurance applies to bodily injury and property damage only if the injury or damage "is caused by an 'occurrence' that takes place in the 'coverage territory.'" *Id.* at 12. As relevant here,

> "[c]overage territory" means **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada; **b.** International waters or airspace, but only if the injury or damages occurs in the course of travel or transportation between any places included in **a.** above; or **c.** All other parts of the world if the injury or damages arises out of: (1) Goods or products made or sold by you in the territory described in **a.** above[.]

*Id.* at 20. *See* Countercl. ¶¶ 31, 44 (citing Compl. Ex. G, at 20). The liability section also contains the following "Crew Coverage" endorsement:

> the number of crew members employed aboard the insured vessel(s) at any one time shall not exceed the number shown on the Declarations page. In the event additional

4

crew members are to be employed, the insured shall give prior notice to [ASIC] and pay such additional premium as is required. If the insured shall fail to give such prior notice at the time of loss in respects to crew there are more crew employed, this insurance shall respond only in the proportion that the stated number of crew bears to the number on board at the time of the loss.

Compl. Ex. G, at 28. The Declarations allow the Bob Rouse to have three crew members onboard at one time. *Id.* at 4.

ASIC alleges that the CMP Policy's "Navigation Area" and "Crew Coverage" restrictions are based on statements in a marine insurance application, allegedly signed by Bindea on January 27, 2020, and submitted to ASIC by someone acting on Bindea's behalf, seeking $1 million in coverage for the Bob Rouse and its three-person crew with "navigational limits required" for the "area around Florida." Compl. ¶¶ 17–18 (citing Compl. Ex. D, at 1–5 (protection & indemnity application), ECF No. 1-4). ASIC also alleges that it "received an additional application form completed and signed by Bindea . . . dated January 29, 2020," Compl. ¶ 20 (citing Compl. Ex. F, at 1–13 (commercial marine package application), ECF No. 1-6), and implies that this form supplemented the original application for coverage on the Bob Rouse, *see id.* ¶ 21; Compl. Ex. F, at 2. The only vessel listed on this form's "Schedule of Covered Vessels," however, is the "Graig Michael" located at Ft. Lauderdale, Florida. Compl. Ex. F, at 6. The form describes the "Graig Michael" as a 110-foot steel-hull supply vessel built in 1977 and valued at $400,000.[5] *Id.* Nonetheless, it appears that ASIC treated this form as an application for coverage on the Bob Rouse, its three-person crew, and its marine operations "'delivering construction supplies'" at or

---

[5] A survey attached to the original application likewise describes the Bob Rouse as a 110-foot steel-hull supply vessel built in 1977. Compl. Ex. E, at 1. It appears Bindea changed the Vessel's name from "Graig Michael" to "Bob Rouse" after he acquired it in November 2019. *See* Compl. Ex. A, at 12–13.

around Ft. Lauderdale, Florida.[6] Compl. ¶ 21 (quoting Compl. Ex. F, at 1–2); *see, e.g.*, Compl. Ex. F, at 2 ("Does this application include all your Operations, Locations and Vessels and affiliated and subsidiary companies? Yes."). This application listed Bindea as the intended insured and sought coverage for both marine general liability (protection and indemnity) and "hull physical damage" in the amount of $400,000. Compl. Ex. F, at 1, 3, 6.

Bindea counters that he "did not complete, sign, or submit" the applications attached as Exhibits D and F to ASIC's Complaint, "nor did he authorize any other individual to complete, sign, or submit [them] on his behalf."[7] Bindea Answer ¶¶ XVII–XVIII, XX–XXI. Bindea was shopping for marine insurance on the Bob Rouse around the same time, however. Countercl. ¶ 12. On January 23, 2020, Bindea contacted Third-Party Defendants John Uhr and ASAP Insurance Agency ("ASAP") to help him procure "hull and machinery coverage" and "protection and indemnity" coverage for the Bob Rouse so the vessel could be used "in humanitarian relief operations in and around Haiti." *See id.* "Bindea and Uhr subsequently exchanged numerous telephone calls and text messages" about this insurance. *Id.* ¶ 13. Those communications occurred while Bindea was aboard the Bob Rouse "transiting [first] from Louisiana to Florida" and then "from Florida to Haiti," or while Bindea was "on land in Haiti." *Id.* "During his multiple communications with Uhr and ASAP, Bindea advised that the Vessel would be

---

[6] Ft. Lauderdale is on Florida's eastern coast, roughly 30 miles northeast of Miami. Haiti is "located about 500 nautical miles southeast of Florida on the western third of the Caribbean Island of Hispaniola." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 166 (1991).

[7] Both applications appear to contain the wet signatures of "Bogdan Bindea." Compl. Ex. D, at 5 (Jan. 27, 2020); Compl. Ex. F, at 13 (Jan. 29, 2020). In his own complaint, Bindea alleges only that he "did not complete, sign, or submit" these applications himself. Countercl. ¶ 26. He omits his prior assertion that he also never "authorize[d] any other individual to complete, sign, or submit" those applications "on his behalf," Bindea Answer §§ XVII–XXI. *Accord* Countercl. & Third-Party Compl. ¶¶ 56–58 (alleging that Uhr, ASAP, and USG were "acting as fiduciaries of Bindea in connection with their effectors to secure insurance coverage on Bindea's behalf" and that they "breached their fiduciary duties" by, among other things, "providing inaccurate or false information" in the two applications on which ASIC based the written CMP Policy).

primarily engaged in humanitarian relief operations in and around Haiti." *Id.* Having

communicated those facts to Uhr, Bindea expected that "the coverages obtained by Uhr and

ASAP would be consistent with the Vessel's area of operations and mission." *Id.* ¶ 14.

Bindea believes that Uhr and ASAP then engaged Third-Party Defendant USG Insurance

Services ("USG"), a national wholesale insurance broker, to procure the "marine insurance

coverages [Bindea] requested." *Id.* ¶ 16; *see id.* ¶ 57 ("Uhr and ASAP, and on information and

belief, USG, knew or should have known that the Vessel would be operating primarily out of

Haiti and would be crewed by more than three crew members."); *id.* ¶ 69 ("Uhr and ASAP, and

on information and belief, USG, knew or should have known that the Vessel would be operating

primarily out of Haiti and would be crewed by more than three crew members and had a

requested insured value of $600,000."). Bindea does not deny that Uhr, ASAP, and/or USG

completed and submitted the two insurance applications to ASIC, ostensibly on behalf of Bindea

as the Bob Rouse's owner and intended insured, or that ASIC relied on representations made in

those applications when issuing the CMP Policy (B5JH04214) on the Bob Rouse. *See generally*

Bindea Answer ¶¶ XVII–XXI; *id.* at 9 (sixth and seventh defenses) (citing Compl. Ex. G);

Countercl. ¶¶ 9, 18–19, 27, 46 (citing Compl. Ex. G); *id.* ¶¶ 26, 53, 58 (citing Compl. Exs. D &

F). The parties agree that both applications contain "materially inaccurate and or false

statements" about the Bob Rouse's "intended operations territory . . . and the number of crew

required and intended to operate the Vessel." Countercl. ¶ 26 (citing Compl. Exs. D & F); *see*

*also id.* ¶¶ 53, 58; Compl. ¶ 18. Bindea denies ever suggesting to Uhr, ASAP, and/or USG that

the Bob Rouse "would operate solely within the east coast of Florida," *id.* ¶ 25, or that it "would

have only three crew members," *id.* ¶ 37. *See* Compl. Ex. D, at 1 ("Specify navigation limits

required: Area around Florida."); *id.* at 4 ("Total number of crew employees all vessels: 3.");

Compl. Ex. F, at 2 (listing "Ft Lauderdale Fla" as the sole "scheduled location [to be] covered" under the CMP policy); *id.* at 5 ("If Crew Coverage option is selected, how many crew are employed: 3."). On the contrary, "Uhr and ASAP had direct knowledge that the Vessel was located in Haiti and would be primarily used for humanitarian relief work in Haiti." *Id.* ¶ 25. USG likewise "knew or should have known that the Vessel would be operating primarily out of Haiti and should be crewed by more than three crew members." *Id.* ¶ 52. The CMP Policy that ASIC issued to Bindea on March 20, 2020, lists USG as the insurance "Producer." *Id.* ¶¶ 19–20 (citing Compl. Ex. G, at 2).

"On March 20, 2020, Uhr notified Bindea via text message that coverage had been bound on the Vessel. That same day, Uhr sent Bindea a screenshot of an email from Leigh Berry, a First Vice President of USG, in which Ms. Berry likewise confirmed that coverage had been procured and bound for the Vessel." *Id.* ¶ 21. Four days later, Uhr sent Bindea a photo of a one-page "Certificate of Liability Insurance" stating that ASIC issued Policy Number "MGL2451933-0" providing Bindea up to $1 million in "general marine liability" coverage and $600,000 in "hull and machinery coverage" effective March 20, 2020, to March 20, 2021. Countercl. Ex. A, at 1, ECF No. 5-2. The certificate identifies the Bob Rouse as the "insured vessel" under this policy, but it does not list any "operations/locations" to which coverage applied. *Id.*; *see* Countercl. ¶ 22 (citing Countercl. Ex. A).[8] Thus, Bindea believed that Uhr, ASAP, and USG had "secured from [ASIC] the marine insurance coverages" that Bindea had requested, Countercl. ¶ 18, including for the Bob Rouse to operate in Haitian waters, *see id.* ¶¶ 14–15, 25. He does not deny that the written CMP Policy at issue here (B5JH04214) suspends all coverage while the Vessel operated

---

[8] The certificate further states that it is "issued as a matter of information only," "confers no rights upon the certificate holder," "does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below," and is "not a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder." *Id.* Uhr's name is written in the "Authorized representative" box.

"outside of the east coast of Florida," *id.* ¶ 45 (citing Compl. Ex. G, at 27, 36 (quotation marks omitted)). *See, e.g.*, *id.* ¶¶ 19, 24, 27, 29, 34, 43, 46, 53.

Bindea alleges that he "was not provided a copy of [this] Policy until after" the Bob Rouse capsized near Port-au-Prince in November 2020, "nor was he advised of the navigational warranty and crewing provisions [that ASIC] is now seeking to invoke to exclude coverage thereunder." Bindea Answer 9 (seventh affirmative defense); *see also* Countercl. ¶¶ 24, 28–29, 34, 36–38, 45 (disclaiming knowledge of the same). The CMP Policy was "delivered to" Bindea in Virginia. Compl. ¶ 2; Bindea Answer ¶ II (admitted); Countercl. ¶¶ 8–9.

*

In January 2021, ASIC filed this declaratory judgment action against Bindea seeking a declaration that the CMP Policy issued to Bindea on the Bob Rouse (B5JH04214) was void *ab initio*, or, even if an enforceable insurance contract exists between ASIC and Bindea, that the policy does not provide any coverage for this Loss because it occurred while the Bob Rouse was in Haitian waters and not within the east coast of Florida. *See* Compl. 7–10. Alternatively, ASIC asks that the "amount of coverage available for claims" under the policy's liability provisions, if any, should be reduced from $1 million to $429,000 because only three crew members were allowed to be aboard the Bob Rouse when the Loss occurred. *Id.* at 9–10.

In response, Bindea filed a combined answer and affirmative defenses to ASIC's claims; a counterclaim for declaratory relief against ASIC; and a third-party complaint asserting three state-law tort claims against Uhr, ASAP, and USG. *See generally* Bindea Answer & Countercl. 1–9, 12–18; Third-Party Compl. 10, 12–16, 18–22, ECF No. 5.[9] Bindea's counterclaim seeks

---

[9] Bindea's third-party complaint asserts that Uhr, ASAP, and USG were negligent and breached a fiduciary duty owed to Bindea because they "provided inaccurate or false information" to ASIC in procuring the inadequate CMP Policy and failed to obtain "the type and manner of marine insurance coverage" necessary to protect the Bob Rouse "based on its anticipated [navigational] area and type of

declaratory judgment that the CMP Policy fully covers the Loss—even though Bindea neither knew about nor agreed to be bound by this Policy's terms—because ASIC accepted "significant premiums" from him. *See* Countercl. ¶¶ 46–47. He concedes that the CMP Policy as written and issued—i.e., the coverage he actually paid for—does not insure against "any damages, losses, or liabilities occurring," *id.* ¶ 29, while the Bob Rouse was "outside of the east coast of Florida," *id.* ¶ 45 (citing Compl. Ex. G, at 27, 36); *see also id.* ¶¶ 19, 24, 27, 32, 43 (same).

Nonetheless, Bindea argues that the Policy's language restricting the Bob Rouse's navigational area to "'within the east coast of Florida' is vague and ambiguous," *id.* ¶ 32 (citing Compl. Ex. G, at 5, 27, 36), and "conflicts" with other language defining the "[c]overage territory," *id.* ¶ 31, for purposes of determining liability insurance as:

> a. The United States of America (including its territories and possessions), Puerto Rico and Canada;
> b. International waters or airspace, but only if the injury or damages occurs in the course of travel or transportation between any places included in a. above; or
> c. All other parts of the world if the injury or damages arises out of:
> (1) Goods or products made or sold by you in the territory described in a. above[.]

*Id.* (quoting Compl. Ex. G, at 20); *see also* Bindea Answer 8 (second defense); *id.* at 9 (sixth defense (citing Compl. Ex. G)). Bindea does not allege that the "claim" he has made "to ASIC for insurance coverage as a result of the Loss," Compl. ¶ 13, involves his potential liability for bodily injury or property damage either occurring "in the course of travel or transportation between" the United States and Canada or arising out of "[g]oods or products made or sold by" Bindea in the United States, Puerto Rico, or Canada. Compl. Ex. G, at 20.

---

operations" in and around Haiti. *See generally* Third-Party Compl. ¶¶ 50–54 (Count II, negligence); *id.* ¶¶ 55–59 (Count III, fiduciary duty); *id.* ¶¶ 60–66 (Count IV, negligent misrepresentation); *id.* ¶¶ 67–73 (Count V, negligent failure to warn).

In short, Bindea asserts that ASIC waived or should be estopped from invoking its right to enforce the CMP Policy's conditions "that the Vessel shall be confined to" a navigational area "within the east coast of Florida" and that, if the Rob Rouse "exceed[ed]" this navigational area, "then all coverage herein [was] suspended until the vessel safely return[ed]" to an area "within the east coast of Florida," Compl. Ex. G, at 27, 36. *See* Bindea Answer 8–9 (second, sixth, and seventh defenses); Countercl. ¶¶ 39, 46–47 (waiver and estoppel). He maintains that ASIC must cover the Loss occurring while the Bob Rouse was "in transit from Port-au-Prince, Haiti to Môle Saint-Nicolas, Haiti," Countercl. ¶ 39, because that is the scope of insurance coverage that Bindea wanted Uhr, ASAP, and USG to obtain for him and that Bindea believed he was paying for, *see id.* ¶¶ 42–49 (Count I).

**

ASIC moved for judgment on the pleadings. ECF No. 35. It argues that Bindea's Answer and Counterclaim admit, allege, and/or fail to deny all the facts necessary to conclude that no valid contract exists between ASIC and Bindea to insure the Bob Rouse against any risk and that, even if the CMP Policy is enforceable, Bindea had "breached" at least two conditions precedent when the Vessel capsized in Haitian waters. Pl.'s Br. in Supp. 7; *see id.* at 8–15 (no contract); *id.* at 16–17 (breach of navigational warranties and crew limits); Pl.'s Reply 2–4, 8–15. Bindea opposes ASIC's motion as premature. *See* Def.'s Br. in Opp'n 8. His legal arguments generally do not address the specific issues raised in ASIC's Rule 12(c) motion. *See id.* at 9–17; Pl.'s Reply 2–13. Bindea's position appears to be that a declaratory judgment determining the CMP Policy's validity and, if necessary, interpreting the scope of coverage thereunder, is premature because Bindea's pleadings raise "estoppel and waiver" defenses or claims against ASIC, both of

which are "highly fact-intensive" and "should be decided by the finder of fact after full discovery and trial." Def.'s Br. in Opp'n 8; *see id.* at 9–17.

## II. The Legal Framework

### A.    *Declaratory Judgment Act*

The Declaratory Judgment Act allows a federal court, in "a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The court may entertain such a request when:

> (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (quotation marks omitted). Within those jurisdictional bounds, "a declaratory judgment action is appropriate when the judgement will serve a useful purpose in clarifying and settling the legal relations in issue and when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004) (cleaned up).

### B.    *Motion for Judgment on the Pleadings*

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Such motions are 'designed to dispose of cases when material facts are not in dispute and the court can judge the case on its merits,'" *Crossroads Equity Partners v. Dogmatic Prods., Inc.*, 317 F.R.D. 529, 531–32 (W.D. Va. 2016) (quoting *Preston v. Leake*, 629 F. Supp. 2d 517, 521 (E.D.N.C. 2009)), considering only the parties' respective pleadings, Fed. R. Civ. P. 7(a), judicially noticed facts or matters of public

12

record, and documents attached as exhibits to the pleadings or to the Rule 12(c) motion that are "integral to the complaint and authentic," *Massey*, 759 F.3d at 347, 353. *See, e.g.*, *WorkingFilms, Inc. v. Working Narratives, Inc.*, No. 7:20cv139, 2021 WL 1196189, at *9 (E.D.N.C. Mar. 29, 2021) (noting that plaintiff's "reply to counterclaims" that were included in defendant's answer to the complaint is a "pleading" under Rule 7(a), and concluding that, "just as [the court] may consider relevant admissions in Defendant's answer, it may consider any relevant admissions Plaintiff made in its reply to counterclaims for a Rule 12(c) analysis"); *Blue Rhino Sourcing, Inc. v. Well Traveled Imports, Inc.*, 888 F. Supp. 2d 718, 725 (M.D.N.C. 2012) (considering content of defendant's "amended answer and counterclaim" when resolving Rule 12(c) motion). "Courts apply the same standard that is applied to Rule 12(b)(6) motions to Rule 12(c) motions for judgment on the pleadings." *United States v. Castillo*, No. 8:19cv3459, 2021 WL 825974, at *3 (D. Md. Mar. 4, 2021).

"To prevail on a Rule 12(c) motion, the moving party must show that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Tapp v. Wash. Metro. Area Trans. Auth.*, 306 F. Supp. 3d 383, 391 (D.D.C. 2016) (cleaned up); *accord Crossroads Equity Partners*, 317 F.R.D. at 531 (noting that "the court should not grant a Rule 12(c) motion unless the movant clearly establishes" both elements). "A fact is material if it might affect the outcome of the suit under the governing law." *Roark v. Universal Fibers, Inc. Assocs. Savs. Plan*, No. 1:16cv40, 2017 WL 177528, at *3 (W.D. Va. Jan. 6, 2017) (quoting *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016)). The court generally must view "the facts presented in the pleadings and the [reasonable] inferences drawn therefrom in the light most favorable to the nonmoving party." 5C Fed. Prac. & Proc. § 1368; *see Penn. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Nevertheless, it need

not accept factual allegations or denials that clearly contradict the nonmoving party's own

pleadings, *see, e.g.*, *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989) ("The general rule is

that a party is bound by the admissions of his pleadings" (quotation marks omitted)); *VIA Design*

*Architects v. U.S. Development Co.*, No. 2:13cv55, 2014 WL 5685550, at *5 (E.D. Va. Nov. 4,

2014) ("Under federal law, an unequivocal assertion of fact made in a pleading, such as an

answer or counterclaim, constitutes a 'judicial admission' that generally binds the party making

such statement throughout the remainder of the proceeding.") (citing *Amgen Inc. v. Conn.*

*Retirement Plans & Tr. Funds*, 568 U.S. 455, 470 n.6 (2013)), or "legal conclusions couched as

facts or unwarranted inferences, unreasonable conclusions, or arguments," *Turner v. Thomas*,

930 F.3d 640, 644 (4th Cir. 2019) (quotation marks omitted). *See also Massey*, 759 F.3d at 353.

　　　Where, as here, the plaintiff moves under Rule 12(c) for judgment on its own claim, the

court should grant the motion only if a defendant's answer or other pleading "admits, alleges, or

fails to deny facts which, taken as true," show the plaintiff is entitled to judgment as a matter of

law against that defendant. *Lowden v. Cnty. of Clare*, 709 F. Supp. 2d 540, 546 (E.D. Mich.

2010) (answer); *see Allstate Ins. Co. v. Vitality Phys. Grp. Practice*, 537 F. Supp. 3d 533, 540

n.1, 542 n.5, 543 n.8 (S.D.N.Y. 2021) (answer and counterclaim); *Blue Rhino Sourcing*, 888 F.

Supp. 2d at 725 (same). Conversely, the court should deny the motion if the defendant's pleading

denies or affirmatively contests "essential facts the [plaintiff] must show to prevail" on its claim.

*Castillo*, 2021 WL 825974, at *7; *see* 5C Fed. Prac. & Proc. § 1368 ("A material issue of fact

that will prevent a [plaintiff's] motion under Rule 12(c) from being successful may be framed by

an express conflict on a particular point between the parties' respective pleadings. It also may

result from the defendant pleading new matter and affirmative defenses in his answer."). Such

genuine factual disputes should be resolved after discovery on a properly supported motion for

summary judgment or by the factfinder after a trial. *See id.*; *cf. Joseph v. Fischer*, 900 F. Supp. 2d 320, 328 (W.D.N.Y. 2012) ("[T]he standard on a Rule 12(c) motion [is] less stringent than the standards applicable to a summary judgment motion or a full-blown trial.").

C.    *Marine Insurance Contracts*

"[M]arine insurance contracts are usually maritime contracts as a matter of law," *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 362 (4th Cir. 2014) (citing *Ins. Co. v. Dunham*, 78 U.S. 1, 30–36 (1870), and therefore fall "within the admiralty jurisdiction of the federal district courts," *J.J. Ryan & Sons, Inc. v Continental Ins. Co.*, 369 F. Supp. 692, 693 (D.S.C. 1974) (citing *Dunham*, 78 U.S. 1). "[D]isputes regarding marine insurance contracts are governed by state law unless an established federal maritime common law rule applies, or the need for national uniformity warrants fashioning such a rule." *Geico Marine Ins. Co. v. Graves*, No. 1:20cv68, 2020 WL 5015359, at *2 (E.D. Va. Aug. 4, 2020) (citing *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321) (1955)), *adopted by* 2020 WL 4979963 (E.D. Va. Aug. 24, 2020). There is no established federal maritime common law rule governing marine insurance contracts. *See Wilburn Boat Co.*, 348 U.S. at 316. Thus, "the scope and validity of [such] policy provisions . . . and the consequences of breaching them can only be determined by state law[.]" *Id.* Federal courts sitting in diversity would borrow the forum State's choice-of-law rules to determine which state's law governed the claims. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "[F]ederal courts sitting in admiralty," however, "apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), and its progeny" to determine which law applies.[10] *Sing Fuels Pte.*

---

[10] "Where the parties have specified in their [insurance] contract which law should apply to their transaction, however, admiralty courts will generally give effect to that choice." *Sing Fuels*, 39 F.4th at 270 (quotation marks omitted). The CMP Policy does not contain a clear choice-of-law provision, *see* Compl. Ex. G, at 46 ("Terms of this insurance which are in conflict with the statutes of the State wherein

*Ltd v. M/V Lila Shanghai*, 39 F.4th 263, 270 (4th Cir. 2022) (quoting *Chan v. Soc'y of Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997) (other citations omitted)); *see Aqua-Marine Constrs., Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997) (explaining that a federal court must determine the source of its original subject-matter jurisdiction over a claim "[i]n order to settle any choice of law issue . . . . because a federal court sitting in diversity applies the choice-of-law rules of the forum state, whereas a federal court sitting in admiralty must apply federal maritime choice-of-law rules" (citations omitted)). Those principles "attempt[] to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction" or occurrence that gave rise to the plaintiff's cause of action "and the states or governments whose competing laws are involved." *Lauritzen*, 345 U.S. at 582. Thus, when there is no federal maritime common law or rule on point, a federal court sitting in admiralty should determine "which state had the most significant relationship to the incident and the dominant interest in having its law applied" in the pending litigation. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 346 (3d Cir. 2000).

*Lauritzen* involved a Danish seaman (Larsen) who, "while temporarily in New York[,] joined the crew of the Randa, a ship of Danish flag and registry," and was "negligently injured aboard the Randa" while harbored in Havana, Cuba. 345 U.S. at 573. As part of his employment, Larsen agreed "that the rights of crew members would be governed by Danish law[.]" *Id.* After his injury, Larsen filed suit in New York federal district court raising a "claim of maritime tort" under the Jones Act, 46 U.S.C. § 688. *See Lauritzen*, 345 U.S. at 573–74. "The key issue" in *Lauritzen* was which nation's law should govern that claim where Denmark, Cuba, and the

---

this insurance is issued are hereby amended to conform to the minimum requirements of such statutes."), and neither party's briefs directly address which state's law governs their dispute over the validity and interpretation of this marine insurance contract. *See generally* Pl.'s Br. in Supp. 8–11, Def.'s Br. in Opp'n 11–16.

16

United States could all "claim some connecting factor with th[e] tort." *Id.* at 573, 582. The
Supreme Court explained

> that courts should consider the following factors when making choice of law
> decisions in the admiralty arena: (1) place of the wrongful act . . . [;] (2) law of the
> flag; (3) allegiance or domicile of the injured [plaintiff]; (4) allegiance or domicile
> of the defendant shipowner; (5) place of contract; (6) inaccessibility of a foreign
> forum; and (7) the law of the forum.

*Hurd v. United States*, 134 F. Supp. 2d 745, 770 (D.S.C. 2001) (marine tort) (citing *Lauritzen*,
345 U.S. at 583–91). "Most of the *Lauritzen* factors are not applicable" in purely "domestic"
admiralty cases, where the choice is between potentially conflicting state law(s) rather than
between United States law and a foreign nation's law. *Id.* at 770. Nonetheless, the Fourth Circuit
has indicated that, "[i]n the absence of a [valid] contractual choice-of-law clause, federal courts
sitting in admiralty" should "apply the federal maritime choice-of-law principles derived from
*Lauritzen* . . . and its progeny" to choose the governing law. *Sing Fuels*, 39 F.4th at 270; *see also*
*World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514–15 (4th
Cir. 2015) (noting that a *Lauritzen* choice-of-law analysis is not necessary where contract at
issue contains a valid choice-of-law clause).

Applying those principles, the Court finds that Virginia law governs the CMP Policy's
validity and scope. First, although the policy does not contain a global choice-of-law clause, it
does state that any "[t]erms of this insurance which are in conflict with the statutes of *the State*
*wherein this insurance is issued* are hereby amended to conform to the minimum requirements of
such statutes." Compl. Ex. G, at 46 (emphasis added). It appears this insurance was "issued" in
Virginia, which was also Bindea's domicile at the time. *See id.* at 1–2. "Under Virginia law, a
contract is made when the last act to complete it is performed, and in the context of an insurance
policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd. v. Am.*
*Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004). The CMP Policy was "delivered to"

Bindea, the named insured, in Charlottesville, Virginia. *See* Compl. ¶ 1; Bindea Answer ¶ I (admitted); Countercl. ¶¶ 8–9 (alleging the same). Accordingly, the facts that this insurance contract was "made" in Virginia while Bindea was domiciled in Virginia favor applying Virginia law to determine the policy's validity and scope. *See generally Lauritzen*, 345 U.S. at 586–87; *cf. Geico Marine Ins. Co.*, 2020 WL 5015359, at *2 (noting that "marine insurance contracts are generally to be construed under the state law of the state in which the insurance contract was formed" and concluding Georgia law applied because "the policy was delivered, to [the named insured], in Georgia") (citing *Wilburn Boat*, 348 U.S. at 321). The "law of the forum" also favors applying Virginia law where, as here, the Defendant lives in Virginia and both parties ask the Court to clarify and settle their legal relations stemming from an insurance contract issued in Virginia. *See generally Lauritzen*, 345 U.S. at 590–92. Additionally, both parties rely (at least in part) on Virginia law to support their positions why the CMP Policy does, or does not, cover Bindea's claimed loss. *See* Def.'s Br. in Opp'n 16–17; Pl.'s Br. in Supp. 9; Pl.'s Reply 3–4.

III. Analysis

ASIC's complaint alleges a live dispute with Bindea over the existence and/or scope of coverage provided by a marine insurance contract on the Bob Rouse, *see generally* Compl. ¶¶ 7–53, which falls within the federal district courts' exclusive admiralty jurisdiction, 28 U.S.C. § 1333. *See Wilburn Boat Co.*, 348 U.S. at 313; Fed. R. Civ. P. 9(h). A declaratory judgment would both "clarify and settle the legal relations in issue" and "terminate and afford relief from the coverage controversy." *Penn-Am. Ins. Co.*, 368 F.3d at 413 (cleaned up). Accordingly, the Court will exercise jurisdiction over ASIC's declaratory judgment action.

A.      *There is No Insurance Contact Between ASIC and Bindea*

ASIC first argues that there is no insurance contract between ASIC and Bindea "because there was no meeting of the minds," or mutual assent, as to the essential terms of any such agreement. Pl.'s Br. in Supp. 7; *see id.* at 8–9. "A contract of insurance, like any other contract, must be based on a mutual agreement." *Dickerson v. Conklin*, 235 S.E.2d 450, 455 (Va. 1977). "Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract." *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007). "[F]or there to be a meeting of the minds, both parties to the contract must agree to the terms, conditions, and elements of that contract; these presuppose knowledge of the contract." *Giodrano ex rel. Estate of Brennan v. Atria Assisted Living, Va. Beach*, 429 F. Supp. 732, 736 (E.D. Va. 2006).

"What Bindea wanted, and what he believed his agents had procured for him [from ASIC], was a contract of marine insurance to cover the [Bob Rouse] in Haitian waters, without restrictions on the number of crew, and with hull and machinery coverage in the amount of $600,000." Pl.'s Br. in Supp. 9; *see* Countercl. ¶¶ 12–14, 16, 18, 25, 57, 69. The applications ASIC received from Bindea's agents contained none of that information, and instead sought coverage for the Bob Rouse and its three-person crew to "deliver[] construction supplies" in and around Ft. Lauderdale, Florida with a lesser amount of hull and machinery coverage. Bindea asserts "that he did not complete, sign, or submit" either application, "nor did he authorize any other individual to complete, sign, or submit [the] same on his behalf." Bindea Answer ¶¶ XVII–XVIII, XX–XXI. Indeed, both contain "materially inaccurate . . . or false" representations that Bindea intended the Bob Rouse to operate within Florida's eastern coast, rather than in and around Haiti, and that the Vessel would carry at most three crew members at one time. Countercl. ¶ 26; *see also id.* ¶¶ 25, 37, 52–53, 57–58, 65. But, those were "the contract terms

ASIC thought were being requested [by Bindea], and an insurance policy satisfying these requirements is what [ASIC] issued" to Bindea on March 20, 2020. Pl.'s Br. in Supp. 9; *see* Compl. Ex. G, at 4–5. Bindea paid (and ASIC accepted) premiums on the CMP Policy as issued. Although Bindea concedes that a written copy of the Policy was "delivered to" his residence, he asserts that he did not receive it, so he did not know that the Policy's terms automatically suspended all coverage while the Bob Rouse was outside the east coast of Florida. In short, Bindea thought he had agreed to pay for "one set of requirements, [while] ASIC was contracting for something else entirely." Pl.'s Br. in Supp. 9.

Bindea's brief does not address ASIC's argument that the parties never mutually agreed on terms to insure the Bob Rouse. *See* Def.'s Br. in Opp'n 9–17; Pl.'s Reply 2. By not addressing that issue, Bindea has conceded it. *See Clear Sky Car Wash, LLC v. City of Chesapeake, Va.*, 910 F. Supp. 2d 861, 871 (E.D. Va. 2012). Even so, Bindea's own allegations show that he "was not aware of the terms conditions, conditions[,] and requirements the [written] contract contained," *Giodrano*, 429 F. Supp. 2d at 736, including the Navigational Warranties and Crew Coverage limitations. Indeed, he disclaims any knowledge that this contract existed before the Bob Rouse capsized. *Cf. id.* (denying defendant's motion to compel arbitration where there was "no evidence that [decedent] was aware of the existence of the contract," let alone the requirement that disputes must be submitted arbitration). Thus, taking the pleadings and all reasonable inferences in Bindea's favor, the undisputed facts show that Bindea and ASIC did not "assent to the same thing in the same sense" and that their minds simply did not "meet as to all the terms," *Dean v. Morris*, 756 S.E.2d 430, 434 (Va. 2014) (quotation marks omitted), under which ASIC agreed to provide the type and scope of insurance that Bindea thought he had applied for and obtained. ASIC is entitled to judgment as a matter of law that the CMP Policy (B5JH04214) is

not an enforceable contract. *Cf. Curtiembre Becas, S.A. v. Arpel Leather Corp.*, No. 1:05cv622, 2006 WL 8446035, at *5 (M.D.N.C. Sept. 21, 2006) (granting counterclaim defendant's Rule 12(c) motion as to counterclaim plaintiff's breach-of-contract claim where the alleged contract for indefinite sale of goods violated North Carolina's statute of frauds, lacked "independent consideration flowing from" counterclaim plaintiff, and contained material "terms and conditions that the parties would determine in the future").

B.      *The CMP Policy's Navigational Warranties Exclude Coverage*

In Virginia, "an application for insurance is merely an offer to enter into a contract. The insurance policy is the contract between the parties." *Smith v. Colonial Ins. Co. of Calif.*, 515 S.E.2d 775, 777 (Va. 1999) (citation omitted). Bindea alleges that he hired Uhr/ASAP to obtain the insurance that Bindea wanted on the Bob Rouse and that Uhr/ASAP used insurance broker USG "to procure marine insurance and coverages" for Bindea's benefit. Countercl. ¶¶ 12, 16–17. He does not deny that Uhr/ASAP or USG submitted the two insurance applications to ASIC, ostensibly on behalf of Bindea as the Bob Rouse's owner and intended insured, or that ASIC relied on representations made in those applications when issuing the CMP Policy (B5JH04214) at issue here. Assuming without deciding that Bindea is bound by his agent's statements on the applications, *cf. Breault v. Berkshire Life Ins. Co.*, 821 F. Supp. 410, 416 (E.D. Va. 1993) (applying Virginia agency law on summary judgment), then there is no dispute that ASIC and Bindea agreed they were contracting for ASIC to insure the Bob Rouse and its three-person crew against certain risks and liabilities while the Bob Rouse was operating "within the east coast of Florida." Compl. Ex. G, at 4–5. The resulting CMP Policy is the only relevant agreement on which ASIC accepted premiums to insure the Bob Rouse. Countercl. ¶¶ 46–47; Bindea Answer 9. Bindea does not allege ASIC issued this written Policy despite knowing that the applications

21

purporting to bear Bindea's signature made "materially inaccurate . . . or false statements" about the Vessel's "intended operational territory" and number of employed crew members, Countercl. ¶ 26. *Cf. QBE Seguros v. Morales-Vázquez*, Civ. No. 15-2091, 2017 WL 5479458, at *11–12 (D.P.R. Nov. 14, 2017) (genuine dispute about "[w]hat information [insurer] had when it issued the policy" despite material misrepresentations in insured's application precluded summary judgment on insured's waiver and estoppel defenses). Nor does he allege that ASIC accepted any payments from him once ASIC learned that "the Vessel's actual and intended area of operation [was] in Haiti." Countercl. ¶ 46.

As noted, the CMP Policy contains two clauses providing that the Bob Rouse "shall be confined to" a navigational area "within the east coast of Florida" and that, if the Rob Rouse "exceeds" this navigational area, "then all coverage herein is suspended until the vessel safely return[ed]" to an area "within the east coast of Florida." Bindea asserts that the phrase "'within the east coast of Florida' is vague and ambiguous," Countercl. ¶ 32, and conflicts with other language defining the "applicable coverage territories" for liability insurance specifically, *id.* ¶ 21. Thus, he asserts ASIC has waived or should be estopped from invoking the Navigational Warranties and therefore must cover a Loss occurring while the Bob Rouse was "in transit from Port-au-Prince, Haiti to Môle Saint-Nicolas, Haiti."[11] Countercl. ¶ 39 (Count I).

---

[11] Waiver and estoppel are affirmative defenses, Fed. R. Civ. P. 8(c)(1), that, while seemingly similar in nature, "should be recognized and applied as distinct legal doctrines, each serving distinct functions," *Emp'rs Commercial Union Ins. Co. of Am. v. Great Am. Ins. Co.*, 200 S.E.2d 560, 562 (Va. 1973). "Waiver, a doctrine at law, is voluntary action or inaction with intent to surrender a right [i]n e[xistence] with knowledge for the facts and circumstances [that] gave birth to the right. Estoppel, as a doctrine in equity, is the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefiting from a change in his position at the expense of the other." *Great Am. Ins. Co.*, 200 S.E.2d at 562.

Bindea asserts that ASIC "waived the Navigational Warranty set forth in the Policy as a condition for coverage and [should be] estopped from relying on that condition in denying coverage under the Policy," Countercl. ¶ 47, because ASIC did not "disclose" the navigational exclusions to Bindea and ASIC accepted "significant premiums on a Policy that, under its interpretation, provided no coverage

"Under Virginia law, an insurance policy is a contract and, like any other contract, the words used must be given their ordinary and customary meaning if they are susceptible to such a construction." *Carolina Cas. Ins. Co. v. Draper & Goldberg*, 138 F. App'x 542, 548 (4th Cir. 2005) (citing *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397 S.E.2d 876, 877 (Va. 1990)). "In the context of insurance policies, this rule means that a judicial interpretation should conform to the plain meaning that reasonable insurers and insureds likely would have attributed to the words." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019). "The search for this plain meaning does not myopically focus on a word here or a phrase there. Instead, it looks at a word in the context . . . in the context of the entire agreement." *Id.* "[E]very word, clause and provision of the policy should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." *Id.* (quotation marks omitted). "If they are clear and unambiguous, their terms are to be taken in their plain, ordinary[,] and popular sense." *Id.* (cleaned up); *see also Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993) ("Reasonable policy exclusions not in conflict with statute will be enforced; to be effective, the exclusionary language must clearly and unambiguously bring the particular act or omission within its scope.").

---

based on the Vessel's actual and intended area of operation in Haiti," *id.* ¶ 46. Bindea does not allege that ASIC's agents *knew* "the Vessel's actual and intended area of operation [was] in Haiti," *id.* ¶ 46, when they wrote, issued, and accepted Bindea's premium payments on a CMP Policy that expressly suspends coverage while the Bob Rouse is "outside of the east coast of Florida," *id.* ¶ 45. Moreover, he concedes this CMP Policy was "delivered to" him in Virginia, Countercl. ¶¶ 8–9, and that his agents submitted to ASIC the insurance applications that "falsely" stated the Bob Rouse would operate in and around Ft. Lauderdale, Florida, *see id.* ¶¶ 26–27; Third-Party Compl. ¶¶ 50–53, 55–58, 65. These facts do not support an inference that (1) ASIC acted or failed to act "with intent to surrender [its] right" to enforce the terms of the CMP Policy as written and issued, *Great Am. Ins. Co.*, 200 S.E.2d at 562 (waiver); or (2) ASIC "changed its position" on some matter, despite having "induced" Bindea's reliance on the prior position, and now wants to benefit from that change at Bindea's expense, *id.* (estoppel).

23

If a policy provision is not clear, Virginia courts generally construe ambiguous terms "against the drafter of the ambiguous language," which in insurance cases "is almost always the insurer." *Id.*; *cf. Midlothian Enters., Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d 737, 741 n.3 (E.D. Va. 2020) ("When an insurer denies coverage based on a policy exclusion, the insurer bears the burden of showing that the exclusion applies."). Even so, the parties' "conflicting interpretation" of policy terms will "reveal an ambiguity only where they are reasonable." *Id.* "A 'reasonable' or 'fairly claimed' interpretation is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision." *Id.* at 356. "The fact that one may hypothesize opposing interpretations of the same contractual provision does not necessarily render the contract ambiguous," *id.* (quotation marks omitted), and Virginia courts should not create uncertainty where none exists by accepting a party's "interpretation [that] is unreasonable in light of the contract as a whole," *Lambert v. Navy Fed. Credit Union*, No. 1:19cv103, 2019 WL 3843064, at *4–5 (E.D. Va. Aug. 14, 2019) (granting Rule 12(b)(6) motion to dismiss Virginia breach of contract claim). *Cf. Dixon Lumber Co. v. Austinville Limestone Co.*, 256 F. Supp. 3d 658, 671 (W.D. Va. 2017) ("[A]lternative but unreasonable interpretations of a contract do not preclude summary judgment.").

The applications submitted to ASIC stated that the Bob Rouse's navigational operations would be limited to the "area around Florida," Compl. ¶¶ 17–18 (citing Compl. Ex. D), or, more specifically, to Ft. Lauderdale, Florida, Compl. ¶ 21 (quoting Compl. Ex. F, at 1–2). Based on those statements, ASIC issued a CMP Policy providing the agreed-upon coverages only while the Vessel was "within the east coast of Florida" and expressly excluding all coverage for any loss occurring while the Vessel was outside of that navigational area. Bindea asserts that the phrase "within the east coast of Florida" is ambiguous, but he does not provide any alternative

24

interpretation of that language. *Cf. N. Assur. Co. of Am. v. D'Onofrio Gen. Contractors Corp.*, No. 08cv976, 2009 WL 1437800, at *4 (E.D.N.Y. May 18, 2009) (noting on summary judgment that "contract language does not become ambiguous 'where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning'" (quoting *Seiden Assoc. Inc. v. ANG Hldgs., Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

More importantly, Bindea concedes that the Bob Rouse was "in Haiti" when this Loss occurred. Haiti is a sovereign nation located in the Caribbean Sea roughly 500 nautical miles southeast of Florida's eastern coast. It cannot reasonably be said to be "within" the east coast of Florida. Accordingly, the CMP Policy's language suspending all insurance coverage for the Bob Rouse while the Vessel was not within the east coast of Florida "clearly and unambiguously bring[s]" this particular Loss "within its scope," *Floyd*, 427 S.E.2d at 196. *Cf. Allstate Ins. Co. v. Vitality Phys. Grp.*, 537 F. Supp. 3d 533, 558 (S.D.N.Y. 2021) (granting insurer's Rule 12(c) motion and entering declaratory judgment that insurer had no duty to defend insured against claims arising out of employee's alleged sexual abuse of patients where policies expressly and unambiguously excluded such claims from insurance coverage). ASIC is entitled to judgment as a matter of law that it has no obligation to cover Bindea's claim for this Loss.

## IV. Conclusion

The Court finds there are no disputed material facts bearing on the parties' coverage dispute and that ASIC is entitled to judgment as a matter of law that it is not obligated to cover Bindea's claim for the Loss at issue. Accordingly, Plaintiff Atlantic Specialty Insurance Company's motion for judgment on the pleadings, ECF No. 35, is **GRANTED** and declaratory judgment will be entered in Plaintiff's favor.

ENTER: September 30, 2022

Joel C. Hoppe
U.S. Magistrate Judge